All right, welcome to day four of the West Court panel. We have three cases up this morning. We'll probably go straight through, but we'll see. First case up, Courtney Payne Snider v. L-3 L. Mr. Butler? Morning, Your Honor. Can I please report? The final judgment in this case comes to the court from two separate orders entered by Judge Wingate. In the first order, he found as a matter of fact that L-3's own lawyers had colluded in secret and made affirmative misrepresentations to L-3 in pursuit of what he called a shocking betrayal of their ethical and fiduciary obligations. Nonetheless, in the second order, he found as a matter of law that L-3 should have known about what he had already determined in the first order to have been done in secret. L-3's position in this case is that the factual findings from the first order are incompatible with the legal conclusion in the second order. The starting point is a conceptual error that Judge Wingate made in analyzing the counterclaim. What is the ruling he made against you that you are appealing that you want to win? The dismissal of the counterclaim. Okay. And in analyzing that counterclaim, he ignored several fiduciary breaches that were pled, including Edwards' unlawful assistance to Janice Wolfe, Wamble Carlisle's breach of its disclosure obligations, and Snider's misappropriation of confidential documents, which no party in the case even moved for summary judgment on. Litigants, of course, are entitled to pursue multiple theories in support of a cause of action, and it was reversible error for Judge Wingate to simply ignore the different breaches that were pled in this case. Even with respect to Edwards' unlawful assistance to Snider, however, that particular breach was timely pled. With the court's permission, I'd like to begin with the discovery rule. And I think, first of all, it's just important that I put to bed the notion that this is an actual knowledge case. Judge Wingate specifically found on page 1810 of his record that L3 was unaware of the unlawful assistance until it received what he termed the explosive email that was a part of Snider's document dump in March of 2011. What Wamble Carlisle repeatedly does in this case is try to conflate the facts. The question is what did Wamble Carlisle know and when did they know it about the misbehavior of their attorney Edwards? Is that the issue? Well, I think that what they would say is that the issue is what did L3 know and when did L3 know it. And that makes perfect sense if this is an actual knowledge case, because if this is an actual knowledge case, then what the client knows, if they have actual knowledge of the unlawful assistance, then the claim accrues. But that doesn't work in a constructive notice case. That's what you knew or should have known, right? Right, exactly. If you would have had actual notice had you exercised it. I was looking at this. I mean, I was looking at some point, like, at some point early on, like 2007, they knew that Edwards had been taken off the case as far as L3 is concerned, right? I think that what they say is that they try to say that, well, L3 must have known because he wasn't allowed to do any work for L3 past 2006. But what the record shows is that September 2006 is the last time that Edwards did any work for L3. But there's no evidence in the record of why he didn't do any work from September 2006 to mid-2007. Now, it's no surprise why he wouldn't have done any work after 2007 because it's no secret that L3 was unhappy about the e-mail he sent suggesting that he could become involved in her internal ethics complaint. But what I think is important is to put to bed the notion that this is an actual knowledge case. It can't be for several reasons. Snyder filed an internal ethics complaint, four EEOC charges, and this lawsuit against L3. If L3 would have had actual knowledge, this lawsuit never would have been filed at all because she tried to voluntarily dismiss her case if L3 wouldn't pursue its counterclaim when everything began to unravel. And, in fact, every one of her lawyers in the case withdrew in the district court citing, quote, professional considerations. Her lawyer, you're talking about Snyder. Right. They all withdrew citing professional considerations and saying that they would have never taken the case in that posture had they been aware of the counterclaim. Then you have the fact that Wamble Carlisle continued to represent L3 until 2009. There is certainly no reason to believe that L3 would have continued utilizing this outside law firm that didn't disassociate itself from Edwards or even report his conduct to the North Carolina Bar Association. When do you claim you had knowledge? When did the statute start running, from your point of view? At the earliest, it would have been in March of 2011 when she provided responses to her request for production, and the explosive email that Judge Wingate referred to was a part of that document dump. So after Wamble Carlisle continues to represent L3 until 2009 and never makes any disclosure of what it has found, and we know for a fact that L3, that Wamble Carlisle knew what was going on back in 2007 yet never made a disclosure to its very own client so that the client could defend itself in the ongoing litigation with Snyder. When did Wamble Carlisle make the phone calls to the lawyer in New York? That was in mid-2007, and it's important to unpack what L3 knew in 2007. All right, and then, I mean, he made the phone calls to, what was the woman's name? Kathleen Carellis. Yeah, Carellis. He made the phone calls to her and says, I'm prepared to talk to you about Edwards, right? I think what they try to do is draw. Is that right? That's right. All right, and so she didn't return the call. He emailed her. She didn't return the call. So, I mean, what kind of position does that put you in? Well, I think that's Wamble Carlisle's favorite argument is to say, well, we sent an email and said, if you wish to talk, we're ready to do so, and they try to draw a line in the sand at that email and say, you didn't return the email, therefore you were not diligent. But the law does not allow them to draw that line right there because the diligence inquiry is a fact-specific determination, which depends on – Well, it may not be. I mean, in other words, it's fact-specific, but what if the issues, I mean, the factual issues are not disputed? Your Honor, summary judgment is not reserved or denials of summary judgment are not reserved only to those instances where the facts are disputed. Even when there's undisputed facts – Well, due diligence is a legal question. I mean, in other words, if the facts are undisputed, whether the undisputed facts amount to due diligence is a legal question, is it not? Not if there are competing inferences that can be drawn from those undisputed facts. And the Mississippi Supreme Court has repeatedly said that the diligence question is a question of fact. Well, tell me how in this case the inferences that can be drawn that would make it a jury question. Right, Your Honor, and I think that's the crux of the question, and I think it's helpful to unpack what L3 knew in 2007 and what they did in response that shows their diligence. What do you mean unpack? Well, unpack the facts about what they knew in 2007 and what they did in response that shows their diligence. Here's what L3 knew in 2007. They knew that Edward – that Snyder had filed an internal ethics complaint alleging discrimination. They then get an email from Edwards that says, I learned, quote, last night that she filed an ethics complaint, and I've done work for the company. We're all on the same side. I could assist if you want me to do so. She then responds and says, you're our lawyers. Okay, but you are not answering the question that I asked. You are unpacking facts, whatever that is. You're unpacking facts that are not specific to the question I asked because I understand what you're saying. Here are the specific facts that I was trying to set up the answer to. Their diligence was that they confronted two of their lawyers. They confronted Edwards and Snyder and both lied to them. I'm talking about limiting the diligence to the failure to respond to the telephone calls and to the email that occurred in 2011? 2007. 2007. That's all I'm talking about now. Right, and I'm telling you why they would not have felt compelled to respond to that email. You can't ignore what happened before that. What happened before is that they had received written assurances from two of their lawyers that said no unlawful assistance had happened. They also had put Wanda McCarlyle on notice that Edwards sent that email, and they certainly had the right to rely on the fact that their very own lawyers— Well, why does that give them the right not to return the calls? I mean why is the failure to return the calls not an act of negligence to the duty of diligence? Well, Your Honor, this is obviously a diversity case, and the Mississippi Supreme Court's decision in 2011 in the Bennett case, it says that the duty of diligence must be judged alongside the duty of full disclosure. In fact, that decision expressly says that we adopt the rule that Mississippi lawyers— Obviously prepared, or at least it's implied, that he is ready to talk about Edwards and give them the whole scoop about Edwards, who'd already been taken off any work that they had, and they just don't return the calls. I mean that—how do you excuse that? Well, Your Honor, according to Bennett, Bennett says that the duty of— I asked how do you excuse it. Because the duty is one of full disclosure. It's not to tell the client you can return a phone call if you wish to do so. Well— That's Bennett. Well, I mean the full disclosure, if they precluded the full disclosure, it seems to me that the duty of full disclosure has been—is not working in your favor to the extent that you're suggesting it does. Your Honor, there never was a disclosure at all, and that's what the law says you have to do. Okay, go ahead. I won't— Well, I think that at the heart of this case is the interplay between the duty of disclosure and the duty of diligence, and that's exactly what was at issue in the Bennett case. And Bennett said clearly—it said we adopt a rule that Mississippi attorneys can't breach their duty to fully inform their clients and then rely on the statute of limitations. We don't think there can be a more clear statement principle than what the Supreme Court said in Bennett. Now, Juan McCarlisle disagrees with our reading of Bennett, but we think it presents a categorical rule that says any interests that underlie the statute of limitations, those interests must yield to the greater interest that we have in ensuring that attorneys comply with their duty of full disclosure. We think that that is categorically what Bennett says, but this Court need not even go that far in this particular case because at a minimum, you have to read Bennett to say that what a client has to do in the way of diligence, that you have to judge that alongside what the fiduciary, the attorney, has an obligation to disclose, and that's why Bennett says that it's a fact question. That email that you're concerned about, Judge Jolly, that is precisely the type of false sense of security that the Bennett case discusses. In Bennett, what you had going on was an attorney who failed to effectuate service of process. That was the underlying malpractice. He had told his client that I'm having trouble effectuating service, but the case is moving along. Later on when he tries to invoke the statute of limitations, the Supreme Court says you can't do that because you didn't make a full disclosure and, in fact, you provided a false sense of security to the client by suggesting that the case was moving along. That's the same type of false sense of security that was provided by that email. The duty was one to make a full disclosure. The email said we reviewed IT information. We can talk if you wish to do so. He'll have no further contact with your client as if to say we've looked at this, nothing to see here, case closed. We know you're mad about it, but he won't have any further contacts. That is the same type of false sense of security that the Bennett case was concerned about and said that lawyers can't get away with. The district court found actual knowledge, right? No, Your Honor. On page 1810 of the record, he specifically found that L3 was unaware of the unlawful assistance until it received what he termed the explosive email. This is a constructive knowledge case, so the idea is would they have actual knowledge had they exercised reasonable diligence? And that's the point here, the quintessential point, is that you would have to find—the question is not do you think L3 could have done more. The question is whether a jury could find that L3 acted reasonably. And to hold that L3 didn't act reasonably, you literally would have to hold that clients can't rely on written representations from their own attorneys and they can't rely on the fact that a law firm would learn of unlawful assistance, not tell its client, not correct the misrepresentations that it's aware of, and continue representing that client for two more years without asking for a waiver, without providing any sort of disclosure. So at a minimum, Your Honor, this is a fact question for a jury. And the Mississippi Supreme Court has repeatedly said that the question of reasonable diligence is for a finder of fact and not a—it's not a question of law. I see my time is about to expire. I would reserve the remainder of my time with the court's permission. All right. Thank you, sir. Thank you. Tom Lee. May it please the court. Your Honors, the unethical behavior by Snyder and Edwards at the heart of L3's breach of fiduciary duty claims is egregious. But the application of this statute of limitations is not a value or ethical judgment. It's a matter of law, and the statute of limitation catches good cases and bad cases alike. Why do we assume that had L3 responded and called to the email and the phone calls to tell me more, how do we know what would have been disclosed? Well, Your Honor, I don't think – in McLemore and PPG, two cases from the Mississippi Supreme Court, they say that the knowledge of the plaintiff is judged by their actions and by their conduct. And what we know in this case is what counsel opposite mentioned, this assurances they got from Edwards. They were not believed by Ms. Kourilas, the general counsel of L3. They occurred the day prior to her complaint. So she actually got these assurances and she didn't believe them. She then called and complained to Wamble. And, in fact, Your Honor, she said she was expecting a return phone call. So she calls and says she's very unhappy with Edwards' involvement in this discrimination claim. She says that he has a conflict of interest. When did this happen? On May 8, 2007. The references that counsel opposite made occurred on May 7, 2007. And interestingly enough, what he did not say is what those emails also said. Yes, he said, I learned last night. But he also said there is an untenable situation that has existed for a very long time at L3 and it's past time to remedy it. He made all kinds of statements in these emails that was a huge red flag to not – to even maybe not a smart lawyer. But Ms. Kourilas was smart. She saw that he was going to be an adverse witness to L3. He even says that in these emails. And it made her mad, rightfully so. And she called the law firm and complained and said she expected a return call. Your Honor, she got three return phone calls and two correspondence and didn't return any of them. And, in fact, what is belied by the point – what belies the point that what they knew or didn't know at that time has all been argument, this is summary judgment. They had the opportunity – there's no affidavit saying what Ms. Kourilas did or didn't think. What we know is what she did do. And she complained. And then she didn't return the phone calls or emails. But L3, in defending their assertion – What did she – what were her concerns that were expressed immediately prior to her receiving these phone calls from Womble Carlisle? What were her concerns expressed to Womble? Yeah, right, at that time. Because I understand what you said. Yes, Your Honor. So she got emails from both Snyder and Edwards in which Snyder said, I would like to have an advocate accompany me to meet with you. And she proffered Edwards. Then there was this series of exchange of emails about he can't do that. And this is where you get the assurances emails. This is all occurring on May 7th. But she did not believe the assurances. That's when she called Womble Carlisle on May 8th and said she's unhappy with his involvement, that he is likely to be an adverse witness to L3, and that he has a conflict of interest, and that Snyder and Edwards have a very personal relationship in which they've exchanged a number of emails. And we know that, Your Honor, because they were reviewing her emails. It's undisputed. They had been investigating her, and that's the Witten report. And those are the phone calls that she did not return. Correct, Your Honor. All right. And when is the next time you heard from her or from L3 concerning their dissatisfaction with Edwards? Never heard from them again until a subpoena in March of 2011, Your Honor. So they called and complained over the course of a week and a half between May 10th and May 18th. So the call from L3 is May 8th. They get three phone calls and two correspondence over the next week and a half from Womble, and they return none of them. Now, her claim is for malpractice. Correct, Your Honor. Malpractice. Breaches. So what are the elements that she would have to have been aware of at this time by virtue of the conversation she referred to in 2007? The breach of malpractice claim based on the breach of fiduciary duty, Your Honor. So what would she have to know at that point in order to file a lawsuit then? That the lawyer was acting adverse to her in assisting in employment discrimination claims, which is exactly what she complained about. And, Your Honor, I'd like to turn to the Bennett case that counsel opposite addressed because I think a discussion of the Bennett case actually proves the point of why this case is really controlled by three things. Two statutes, 15149, 15167, that codify the reasonable diligence requirement. You're saying she had actual knowledge in May of 2007? Yes, Your Honor. Judge Wingate said she did not. That's not true, Your Honor. In fact, what counsel opposite is citing too is the order dismissing Courtney Payne Snyder's counterclaim. That occurred prior to the summary judgment hearing and consideration of summary judgment on the counterclaim. And in the district court's order of 16-page order dismissing their legal malpractice counterclaim, he specifically found that they knew or should have known by May of 2007. In other words, that their claim accrued at that time. In other words, that it's not latent at all. And under the statutes, you don't get to even look at reasonable diligence if the injury was not latent. Here we had a lawyer who identified the breach of fiduciary duty going on. That is not a latent injury. They identified it. They complained about it. And then they didn't exercise reasonable diligence. And what was it – what's the difference between the state of knowledge in 2000 – what did they learn in 2011 that they didn't know in 2007? Your Honor, that's where they say their claim is this explosive, email that they got when they subpoenaed records from Courtney Payne Snyder. And they got this email where Mr. Edwards was assisting her in drafting a EOC complaint. That's the, quote, for your eyes only email. But, Your Honor, that was to her AOL account. But it's undisputed that AOL was – or that L3 was reviewing her emails. And the very same drafts of this complaint were on L3's system, that they were reviewing her emails. That's a record at 5893 through 95 and 97. So very same emails are going back and forth to her L3 email. And they have claimed that this AOL email was secret. But ironically, the email that the counsel opposite discussed where Edwards said, I learned last night, went to Jim Slavin at L3, and he copied Courtney Payne Snyder's AOL email. In addition, L3 has claimed privileged attorney work product in the 2007 timeframe that contained emails from Courtney Payne Snyder sending an email from her L3 account – or her AOL account, the supposedly secret account – to their own investigator at L3. And that was Jackie Hill, Your Honor. But Bennett – the Bennett case – to apply Bennett here would require reading out the reasonable diligence requirement from both 15149 and 15167. The Mississippi Supreme Court didn't say we're reading out or writing out the reasonable diligence requirement in those two statutes, nor really could they do that. And in fact, the court went on to actually analyze the two sisters' reasonable diligence requirement. If they were – if counsel opposite's argument was correct, why then did the court go and analyze reasonable diligence? Well, if there's actual knowledge, why are we even talking about reasonable diligence? I agree, Your Honor. In fact, I'm only addressing it because of them. I think Judge Wingate was absolutely correct in finding – What – you say they knew everything in 2007? They knew what PPG and McLemore say, Your Honor, is enough. And quite frankly, what this court recognized – That's exactly what they knew. What they knew in 2007 was that Edwards and Courtney Payne Snyder were colluding together to bring employment discrimination claims against L3. They knew that Edwards was likely to be an adverse witness, and they knew that it was either an adverse advocate because that's what Courtney Payne proffered him as. When he said, oh, I wouldn't do that, then he was going to be an adverse witness. And they knew that he had a conflict of interest. And they knew that he and Snyder had a very personal relationship in which they exchanged a number of emails. And, Your Honor, they also knew – They knew about Snyder's and Edwards' personal relationship as early as 2007? Yes, Your Honor. In fact, it's mentioned in the Whitten report where they reviewed 1,375 of her emails and said that there were inappropriate emails with Edwards, Wolf, and many others. What is the date of the issuance of the Whitten report? It's December of 2006. And in that report, their lawyers, two sets of them, even recommended terminating Payne Snyder for her breaches of fiduciary duty to the company. So they also knew in her breaches coming back to – Did the Whitten report make any reference to Edwards at that point? Just the inappropriate emails between her and Edwards and others. But nothing relating to conflicts of interest at that point? Not at that point, Your Honor. But we do know that L3 had – Steve Sinkfield had specifically prohibited Courtney Payne from using Edwards on any other cases. So we knew that had already occurred. Then we knew about the inappropriate emails. And then it culminated on May 8, 2007, when L3, Carrillo's complaint – The record doesn't reflect that, Your Honor. We don't know the answer to that, but we know he did it. Your Honor, two, I agree and I think the district court was correct to find there wasn't a latent injury based on Macklemore and PPG, which it cited because the Supreme Court of Mississippi has said a plaintiff does not have to know with certainty the full extent of the conduct. They just have to know that it was legally negligent or negligent as a matter of law. In PPG-Lowry, the court says this. The test is whether the plaintiff's own suspicions and actions thereon were enough to vest the right to a cause of action against the defendant. It's when they knew or suspected they knew. And in fact, this court, Your Honor – What could they have sued for in May of 78? I'm sorry. May of 2007. Breach of fiduciary agreement. To recover what? He was assisting her in her employment discrimination. Damages? Injunctive relief? What could they have sued for at that point? They could have done both, Your Honor. What were their damages at that point? Their legal costs in defending and responding to Courtney Payne Snyder's internal discrimination complaints. Your Honor, this court in First Trust v. First National Bank really rejected the argument that L3 – I'm sorry, Your Honor, I see that I'm out of time. Well, you have a rebuttal? I'm sorry, Your Honor. You're straight on, no rebuttal. All right, one sentence. Finish the sentence you were trying to say. I'll just say this, Your Honor. When the undisputed facts are applied to this court's statement in First Trust that, quote, none of these facts comport with the picture of an entity's remaining blissfully unaware that a cause of action had probably or potentially arisen. Thank you, Your Honors. Thank you, sir. Mr. Lassiter. Thank you. It's kind of hard to keep up who is arguing what and who is on whose side in this case. I'll do my best to make it clear. So, I mean, what you're complaining about is the dismissal of the complaint as a sanction? Is that what you're complaining about? That's correct, Your Honor. I'm here to argue whether or not the district court, as an Article III judge, was able to inherently sanction my client and do so lawfully. And in the order that dismisses my client's case, there is an inordinate amount of concern for pre-litigation conduct. Her pre-litigation conduct and Mr. Edwards' pre-litigation conduct. And there's an aggregation whereby at some point Mr. Edwards and the rank hearsay emails that he drafts all of a sudden becomes my client's conflict. Okay. But what is your underlying complaint of your client? What does your complaint allege? Discrimination related to a hostile work environment, gender discrimination, and retaliation for some of the lawful issues that she raised with respect to the— Relating to any particular incident or— Related to an early incident and a denial of a bonus, whereby her male counterparts were given bonuses for the sale of some of L3 subsidiaries. She was an officer. She was the only officer that was female and the only officer that was denied payment there. That is one distinct discrimination that has nothing to do with retaliation. It stands alone as a discrimination claim. And I do think that's something that sets this case apart from the Douglas decision. Douglas is a narrow holding related only to whether or not the protected activity under Title VII can also be unethical conduct of counsel. I do believe that this focus by the district court on pre-litigation conduct and the ethics involved really is in deference and in considering that ultimately, substantively, my client won't have a Title VII claim here. I think there's always a reluctance by an appellate court to reverse for some other reason only to see that the claims end up being in the same place. But I think this case is very different from the Douglas case. In the Douglas case, there was a trial. Ultimately, the jury only returned a verdict for the Title VII retaliation claim. There were certainly distinct violations of ethical duties. What was the reason given by Judge Wingate for the dismissal of the lawsuit as a sanction? He believed that there— What did he say? He said that ultimately there was a concealment of her activities that spanned for a number of years from her pre-litigation conduct to her in-litigation conduct. Your Honor, there had to be clear and convincing— In other words, she being a lawyer, all of her conduct pre-litigation and post-litigation? I mean, but anyway, pre-litigation was in violation of her duty as attorney that she owed to her employee. Is that what you're saying? Yes, Your Honor. The order determined that her unethical conduct poisoned her EEOC complaint that was filed and ultimately poisoned the entirety of her complaint, and then her concealment of those ethics or unethical acts also took place in litigation, but there's simply no basis for determining that her in-litigation conduct was anything other than ample and any duty that's bestowed upon a litigant. When you look carefully at her October 2011 deposition, there is one question posed to her. The question is asked, was Charlie Edwards assisting you? And if you read in context—and I said the same thing at the district level— if you read the entirety of that deposition, we all know depositions to be organic matters, where the counsel may not be intimately familiar with the documents being asked, and so the same might be true for the witness. The question is asked, was Charlie Edwards assisting you on the heels of pages and pages of speaking objections related to whether or not he was formally representing her? And there was absolutely a confusion on the part of the witness whereby there's 20 pages of discussion about Charlie Edwards' assistance to her, and then she unarticulately answered that question. If you look at that question in isolation, it is a falsity. However, you have to look at it in the context of the pages and pages of discussion  But if she did, if she did make a false statement in that connection, would Judge Wingate have been justified in dismissing her case as a penalty for that? I believe that a dismissal requires a stubborn insistence to thwart authority. Yes or no? I believe no, Your Honor. And why? Because one question against the actual fact that she produced documents that were the very essence of the counterclaim that was raised against her. This explosive document they're talking about, she didn't conceal it. She willingly produced it. In early 2011, prior to any counterclaim, prior to the motion for sanctions, which is why I'm here, it was her production and her participation in litigation, including if she had a stubborn resistance to authority. In 2012, she absolutely testifies that he was the impetus to her lawsuit, that he did assist her. He was the quarterback. The position that L3 furthers is that she came clean at that point. And it doesn't make any—it's nonsensical to believe that. The much more objective reason to look at that is to ultimately determine that she always had the intent to tell the truth, that it was known to everyone that Charlie Edwards was involved in her back in May of 2007. And so her testimony comports with that. And the one limited question that's asked her and the answer given was a matter of confusion. There's absolutely—and I've looked over this time and again— no basis for a conclusion when, in fact, her end litigation conduct gave up all the information that L3 is now using against her. She produced—back to the production of documents, she's testified that she produced all the emails in her possession. And when asked specifically, will Wanda Carlisle have more emails in response to a subpoena, she says, I have no clue. She doesn't deny it. She doesn't take the tact that's taken by the litigants in Brown or some of the cases that are cited by L3 where the falsity actually helps that litigant in both pieces of litigation. And if you look at those cases, the lies are imposed in order to support the claims in both litigation. And I can see I'm out of time. If I may finish this one thought, Your Honor. In this case, in the 2012—there's no stubborn resistance of authority here. She tells the truth in 2012 against her very own interests in the North Carolina lawsuit, against her very own interests in responding to the counterclaim that's been furthered by L3. There is absolutely no basis for concluding that her behavior rises to the behavior that occurred in Brown and those other cases cited by L3. We would ask that we reverse the sanction order. All right. Thank you, sir. Back to you with rebuttal, Mr. Butler. Your Honor, just a few quick points. I've got to deal with this issue about this being an actual knowledge case. It is not. What Judge Wingate said in his order, he recited the standard for the discovery rule and said you have actual knowledge or you should know with reasonable diligence. What didn't L3 know in 2007? They didn't know about the adverse assistance. When Corellis's 2007 email says you have a conflict, that is in response to Edwards saying I learned, quote, last night that she told me about the ethics complaint. There's a very big difference between thinking somebody has bad professional judgment and knowing that somebody has adversely assisted the client. Those are two very different things. She said that L3 knew in May of 2007 that Edwards might be an adverse attorney or adverse witness. She said that he could be a witness because he learned last night that she filed the internal ethics complaint. And they keep saying that they quit using Edwards in 2007. You can look at his own email in 2007, and it says we're, quote, all on the same side. He was still representing himself in 2007 as somebody who had their best interests at heart. He made the quote sometime at one point that L3 knew they were colluding to bring a claim in 2007. There is no evidence of that. Judge Wingate cites no evidence of that. This is not an actual knowledge case at all. This is a constructive knowledge case. What about the argument that the complaint was in the L3 email? The idea that it was on their computer system. A few points on that. First of all, Judge Wingate did not rely on that. Second of all, this court's decision in Fairchild says you cannot impute that kind of constructive knowledge on a corporation. Third, to the extent that there was any monitoring of emails, that only shows L3's diligence. We know that they didn't find the adverse assistance. They wouldn't have kept using the law firm. They would have used it to defend themselves. Is there any explanation for why a New York lawyer did not return the phone calls to one McCarland? Well, one, the explanation is this. First of all, she is the general counsel of the parent corporation. She's not even the one on the ground level that is intimately involved in this that assigns the cases. So in response to my question, the answer is no. We haven't had any discovery in this case. Judge Wingate didn't even acknowledge the 56D motion that we filed for anybody to depose her. But there's good reasons that show why she wouldn't be compelled to respond to that email because she'd already received written assurances from her very own lawyers that no adverse representation had happened. Those are your reasons and not hers. Your Honor, I think those are – we're talking about summary judgment and what reasonable inferences can be drawn from the facts. And I certainly think it's reasonable to be able to rely on your own representation from your own attorneys, especially when you've also put the law firm on notice and the law firm doesn't correct the known representations. They don't give you the very evidence you need to defend yourself. But I thought one of the emails said something bad has been going on for a long time that needs correcting. What did that mean? Edward's email? I thought that – Edward's email. That's Edward's email. He said that an untenable situation. I think that's what counsel said. He said that that was in reference to saying I learned last night about the filing of the ethics complaint and we're all on the same side. And then after that, he makes an affirmative representation to his client that no unlawful assistance has taken place. Warren B. Cordell's position in this case is essentially you messed up and trusted me. And that's what they're advocating. And that literally turns the duty of disclosure on its head. The – Snyder's counsel made mention of the Douglas v. Den McDermott case that you wrote, Judge Jolly. And that says as a matter of law that an in-house counsel's behavior is unprotected under Title VII as a matter of law because we hold them to a higher standard than we do normal litigants. That's precisely the rule the Mississippi Supreme Court adopted in the Bennett case. And they said we – Smart court. Pardon? Smart court. I agree, Your Honor. I agree. And I think that at a minimal, this is a fact question for a jury because the diligence inquiry is a question for a final fact. And we would ask that this court reverse its mission. All right. Thank you, Mr. Butler. Thank you to all counsel for your briefing. The case will be submitted. Call the second case up, Flores v. United States.